## Joseph Campau and Another v. George M. Dewey and Another.

The Circuit Courts have power, under the statute, to change the venue in actions of ejectment, on cause shown.

A deposition of a witness who does not understand the English language, may be taken under the act of 1848, (*Comp. Laws*, § 4270 *et seq.*) through an interpreter

CAMPAU v. DEWEY.

It is not a valid objection to a deposition taken under said act that it is taken down in the narrative form instead of by question and answer.

The notice of taking depositions under said act, when not served by an officer, must be verified by the affidavit of the party himself, or, at least, if a suit be pending, of his attorney of record.

A party has no right to cross examine witnesses to facts and circumstances not connected with the matters stated in his examination in chief: — (*People v. Horton*, 4 *Mich.* 67).

General hearsay and public reputation are inadmissible to prove which of two persons claiming, by the same name, a particular reservation made by the treaty of Saginaw of September 24, 1819, was the person intended: — (*Stockton v. Williams*, 1 *Doug. Mich.* 546.)

Ejectment for land reserved by said treaty, by the force of which the title itself passed, and required no patent. Subsequent to the treaty an act was passed by Congress for the issue of a patent for the land reserved, to a person claiming to be assignee of the reservee, on proof being taken of the assignment. Proofs were taken, and patent issued. *Held*, that as the title was beyond the control of Federal legislation, the act and proceedings under it could not be given in evidence in this suit for the purpose of showing that the assignor of the patentee bore the name of the reservee named in the treaty. They were *res inter alios*, and the proofs extra judicial.

One of the adverse claimants under this treaty was an Indian child, of the full blood, six years of age at the date of the treaty. Evidence that for seven years after the treaty the witness heard no claim made by the band to which this child belonged, that any reserves were made for Indians of full blood, is not competent for the purpose of showing that she was not the reservee intended, since neither the neglect of others to make the claim, nor of herself at that age could affect her rights.

The court can not, from a construction of said treaty itself, interpret the words "Indians by descent," as used therein, to mean persons of mixed white and Indian blood only, and not full blooded Indians.

Nor can the court say, from the language of the treaty, the policy of the government as indicated by the Indian treaties, public records and despatches, and the habits and modes of life of the Chippewa nation, that a presumption arises that all the reservees in said treaty were persons of mixed white and Indian blood.

The question of the identity of a reservee named in said treaty is entirely one of fact for the jury.

*Heard January 9th, 10th, 11th, 12th and 14th. Decided November 20th.*

Error to Saginaw Circuit.

The action was ejectment, originally brought by the defendants in error, in the county of Genesee; from which the venue was removed to Saginaw, by an order made April 29, 1859, on motion of plaintiffs, and on cause shown by affidavit.

On the trial, before a jury, the plaintiffs [below] read in evidence articles of the Treaty made and concluded at

Saginaw, between the United States, by their Commissioner Lewis Cass, and the Chippewa Indians, on September 24, 1819; which Treaty is to be found in 7 United States Statutes at Large, 203 to 206.

And also adduced evidence tending to prove, that in the year 1820, the premises described in the plaintiff's declaration were surveyed and located under the authority and direction of the President of the United States, as the 640 acres of land reserved by the third article of said Treaty of Saginaw, for the use of Tawcumegoqua.

Evidence was also adduced on the part of the plaintiffs, tending to prove that at the time of the said Treaty of Saginaw, and for many years prior and subsequent thereto, a band of Chippewa Indians resided at the village of Pewanigowink, on the Flint river, and about ten miles below the Grand Traverse of that river, in the place where the present city of Flint is located. That during all the time referred to, Neome was the chief of this band, that Tonedogane was the principal warrior or second chief of this band, and succeeded Neome in the chieftainship on his decease. That one Mixanene was also a member of this band, and a brother of Neome, and that Mixanene had a daughter named Tawcumegoqua, who was about six years of age at the time of the treaty, and was a member of Neome's family. That Neome also had three children; two females, Sagosaqua and Owanonaquatoqua, the former about ten or twelve years old at the time of the treaty, the latter a woman grown, and one boy, Ogibwok, who was about 15 years of age, and a grandson called Metawanene, — that all the children named were full blood Indian children.

That at the time referred to, Jacob Smith had a store near the Grand Traverse of the Flint river, in which he carried on trade with the Indians of that vicinity, and was a man of considerable influence among them. That Neome, his children and said grandchild, and his band, including

Tonedogane, and also Mixanene and his little daughter Tawcumegoqua, were present at the treaty. That Jacob Smith was there also. That on the night prior to the last council, at which the treaty was read over, agreed to and signed, Jacob Smith came to Neome's tent and advised him to get special reservations of land for his children, and promised to assist him in doing so. That at the grand council held the next day between the Indians and General Cass, Neome came forward before Gen. Cass, with his three children, Owanonaquatoqua, Sagosaqua and Ogibwok, and said grandchild Metawanene, and also his neice Tawcumegoqua, Mixanene being with him, and Jacob Smith standing by his side, and asked for reservations of land for these children; that Gen. Cass assented, and that the names of the children were written down, and that it was talked of and understood at the treaty that these children got special reservations of land. The plaintiffs introduced the evidence of several witnesses, tending to show that the Crow, called in the treaty a Chippewa chief, to whom a reservation was made, was a full blood Indian. That for thirty years or more, subsequent to the treaty, Neome's band continued to reside at Pewanigowink, upon the reservation described in Article 2d of the treaty as "one tract of 5760 acres upon the Flint river, to include Rheaume's (Neome's) village (Pewanigowink), and a place called Kishkawbee." And that during a portion of this time the Indian children above named, including Tawcumegoqua, resided with the band upon this tribal reservation, and a portion of the time Tawcumegoqua, with her family, and another family of said band, resided on the premises in question.

Evidence was also adduced on the part of the plaintiffs, tending to prove that, about the year 1830, the Tawcumegoqua above mentioned was married to an Indian named Kahzheauzungh, by whom she had three children, that she died at some time in the fall of 1848, leaving these children her heirs at law.

In order to deduce title to the premises in controversy from the Tawcumegoqua above named, several conveyances were given in evidence by the plaintiffs, who then called as a witness, Noc-chic-a-me, who, on his direct examination, testified as follows: .

"I live below East Saginaw. I am a chief. I was present at the treaty at this place, made with Gen. Cass; was then a man grown up; was acquainted with Neome, Mixanene and their families. They lived at that time at Pewanigowink. The chief of the Pewanigo Indians was Neome. Neome's children at that time were two, and a grandchild, Owa-non-a-ke-to-qua, Segoss, and Metawanene; the last is the grandchild. Mixanene had one little girl, Tawcumegoqua. Neome and Mixanene had their children at the treaty. I heard at the treaty that the Indians were to get some land. I heard the chiefs speaking of it at the place where they were holding council."

*Q.* State to whom were individual reservations made.

" John Riley, near the mouth of the river ; James Riley opposite, below here; another for the Crow against the island below here; Peter Riley, at Carrolton. The three Rileys were half bloods, the Crow was a full blood, afterwards a chief. Others had land reserved on the Flint river; to Owanoneketoqua, Tawcumegoqua, Segoss, and Metawanene; the reserves were at Muscatawing (Flint) ; Peonigowink means Flint. Gen Cass was present where the talk was, at the wigwam; Neome was present also; (mentions five), and a good many chiefs ; can't name all of them. These children were brought forward by Neome to Gen. Cass when the grants were to be made, the Indians consenting. The children's names were Owanmeketoqua, Tawcumegoqua, Segoss, and Metawanene, to whom the grants were made. Tawcumegoqua lived at Peonigo after the treaty ; Segoss lived at the same place. She is still living; she is present."

On his cross examination this witness testified as fol-

lows: "Wabaskendip, (Henry Conner), interpreted at the treaty; Odabandon also interpreted. Wabaskendip interpreted for Neome at the treaty. He interpreted all the time. There were half-breeds present. I knew of other half-breeds being there trying to get land. There was one half-breed there by the name of Nawagesick; I don't know where he lived. I know some other half-breeds there now, but I don't care about calling them. I know Wabaskendip. Saw some half-breeds that came from towards Detroit — women; they came desiring lands. Owashamegan, a half-breed Indian woman, got land at that treaty; I don't know how much or where situated. Perhaps it might be at Muscatawing (Flint). She was a grown person."

*Q.* Was this Owashomegan any relation to Tonedogane?

, The counsel for the plaintiffs objected to this question as irrelevant to the subject matter of the direct examination, and the objection was sustained by the Court.

"Her father was a Frenchman."

*Q.* What band did her mother belong to when she was born?

To this question the like objection was made and sustained.

"Did not see Kasegansequa at the treaty to know her by that name."

*Q.* Did you hear then or shortly afterwards any person say that land was to be reserved for Kasegansequa?

Counsel for the plaintiffs objected to this question, so far as it relates to what was said after the treaty. Whereupon the counsel for the defendants stated that this is for the purpose of showing that the witness said on a former occasion that he heard that Kasegansequa was to have lands, at that treaty or shortly afterwards. The objection was sustained by the Court.

The evidence on the part of the plaintiffs having been

closed, the defendants introduced evidence tending to prove that, during the last half of the last century, a French trader by the name of Bolieu, but generally known to the Indians and by them called Kasegans, resided among the Indians in some part of the territory now embraced within the counties of Oakland, Lapeer and Genesee; that he was married to a full blood Indian woman (who was related to Neome and Tonedogane) of the Pewanigo band of Indians; that by this woman he had several children, one of whom was a daughter named in French, Angelique; but in Indian, Tawcumegoqua; that on attaining about the age of twelve years this daughter was sent to the white settlement, at or near Detroit, and partially educated; that on attaining womanhood she married a Frenchman named Coutant, and settled near Connor's creek in Hamtramck, Wayne county, where she continued to reside, living after the manner of the French inhabitants until her death, which occurred at some time between the years 1825 and 1830; that she died leaving two children surviving her, a son, Simon, who married a wife named Mary, and a daughter, Angelique, married to Nicholas Chauvin, who were her sole heirs at law — that during the whole of her residence at Connor's creek she was on intimate and friendly relations with the Pewanigo Indians; that Neome and other members of his band were in the habit of visiting her and camping around her house, and spoke to and of her as a relative, and that she usually accompanied them to Malden when they went there to get presents from the British Government; that at the time of the treaty she was between 45 and 50 years of age; that she went to the treaty for the purpose of obtaining a reservation of land as a half-breed; that she made active exertions at the treaty to secure such a reservation, both among the whites and the Indians of Neome's band, who were there assembled, and was assisted by numerous and influential friends and acquaintances; that on the reading of the

treaty at the last council, when it was assented to by
the contracting parties and executed, she was referred to
and pointed out by Henry Connor, who acted as inter-
preter of the treaty, as the person for whom a section of
land, to be located at or near the Grand Traverse of the
Flint river, was reserved under the name of Tawcumego-
qua; that on the execution of the treaty she was con-
gratulated, by those present, upon having obtained a sec-
tion of land by it, and was generally understood to have
so obtained it; and that during her lifetime she claimed
to be the person for whom the land in question was re-
served, and to own it, and that her heirs claimed to own
it after her decease.

Among the witnesses called by the defendants to sus-
tain the issue on their part, was one George B. Knaggs,
who testified that he was present at the treaty; that he
knew Madame Coutant; that her Indian name was Tawcu-
megoqua, and that she was at the treaty; and having
also testified to various events as having transpired at the
treaty, tending to show that she was the Tawcumegoqua
intended by the treaty, this witness was then asked, by
the counsel for the defendants, the following question:

While going home from the treaty, or at Detroit
after the treaty, did you hear anything said about Tawcu-
megoqua getting land? The counsel for the plaintiffs ob-
jected to this question as incompetent, and the Court sus-
tained the objection, as it did also the same objection
to the following questions:

Recently after the treaty were there any conversations
as to who had reservations at the treaty?

Was Mrs. Coutant, or Tawcumegoqua, after she went
to Detroit, generally reputed to have obtained a section
of land at the treaty?

Said witness Knaggs, having also testified that he at-
tended the following treaties between the United States
and the Indians, namely: the treaty at St. Joseph, the

treaty at Chicago, at Maumee, and at Tippecanoe, and that at the treaty of Saginaw, of 1819, none of the persons to whom special grants were made were presented in council; was asked the following question : At any of the other treaties you have named, were any persons, for whom special reservations were asked, presented to the Commissioners in council? *Answer.* It was not customary for Indians, or half-breeds, to be presented when asking for lands.

Peter Provencal was also called, and testified as a witness on the part of the defendants. He testified that he knew Madame Contant, and her sisters, Mrs. Lapparle and Mrs. Duchane, both before and after the treaty; her name was Angelique Contant; "I did not know her Indian name at the time of the treaty; heard her family called the Kasegans family; the Indians said the Kasegans family used to live at the Little Springs; during the year 1820, and from that time to 1831, I resided at Saginaw, and was in the employ of the United States Government as blacksmith for the Indians."

The counsel for the defendants then offered to prove by this witness, that in August, 1820, he heard Neome and various other Indians of his band say that they had given the Kasegans family land at the treaty, and that on one occasion he heard Neome say to Lapparle, son of Mrs. Lapparle, and nephew of Madame Contant, that the Indians had given land to his (Lapparle's) relatives, and that he (Neome) wanted Lapparle to remember it and give him something. To this evidence the counsel for the plaintiffs objected, on the ground that it was hearsay, and the Court sustained the objection.

Wabashonoqua, an Indian woman, was also called on the part of the defendants. And after having testified that she was present at the treaty, and had resided among the Indians of the Saginaw valley ever since that time, she was asked the following question on her direct examination; which was overruled by the Court.

Do you know whether there was a common rumor or tradition among the Indians, during the ten years next succeeding the treaty of Saginaw, of 1819, as to whether the half-breed Tawcumegoqua (alias Madame Coutant) got land at the treaty, and if so, what was the rumor or tradition?

The defendants afterwards called Louis Campau as a witness, who, on his direct examination, testified as follows:

"I reside at Grand Rapids; am 68 years old last August; remember the treaty of Saginaw; I resided here at Saginaw at that time; had resided here about four years before that time; was engaged in trading with the Indians; Joseph Campau is my uncle; I had a store here, it was up the river a little way here; I was here at the treaty; I was engaged in trading from 1816, keeping store here in winter, and in summer at Detroit; I knew Madame Coutant; she lived above Detroit; knew her before I came here; saw her at the treaty; she was a half-breed; not less than 40 years old; I knew her two boys very well, and have slight remembrance of her daughter; she said to me that she expected to share with the other Indians; she made great efforts to get land at the treaty, and said she succeeded; I remember Mr. Connor, old Mr. Reiley, Beaufait, Knaggs, Visger, Lieb, Forsyth, Tucker, Hersey, and a half-breed by the name of Walker, Knaggs brought with him from Mongouquagon; Mrs. Coutant, at that time, stood on very friendly terms with the whites; if there are any of the witnesses to the treaty alive it is Mr. Hersey, on Walpole Island; heard he was alive last summer; I saw Hersay in 1836 at Chicago; the other witnesses are all dead; I was requested by Gen. Cass to come ahead and make suitable provision for council-room, dining-room, kitchen, &c.; I came here about a month in advance; the most of the going in and out was at Gen. Cass's office and dining-room; these were private conferences; there was a log storehouse between the office and

dining - room; council - room was six or eight rods off; to the best of my recollection, when Gen. Cass arrived in the afternoon he sent messengers to invite the Indians to come together next morning; that is after all his department had got here; next morning at ten o'clock Indians and whites got ready and council was had; the object of this council was to let them know that he, Gen. Cass, was sent by their great Father to make a treaty with them; that he wanted to buy their land, — (describes land); told them to go back and smoke and think about it; no more public business for three or four days.

"After that he called them together; there was a good deal of trouble to get an agreement among the Indians; then there was a second council; big difficulty; all frightened; Gen. Cass among the rest; the object of the second council was to declare to the Indians on what terms he was instructed to treat with them; the next council, I believe, was five or six days after that; the time occupied making the treaty was in all nine or ten days; the object of the last council was to read the treaty to them; it, was read to them, and interpreted by Connor; I was present during all the time of the last council; the Indians' tribal reservations were first read; Gen. Cass sat in the northeast corner of the shanty, near a table; there was a row of logs in front on which Indians sat; after they got through general reservations, commenced reading reservations to the half-breeds, children of Reiley, then others, then to Mrs. Coutant; Mrs. Coutant was opposite Gen. Cass; Connor pointed out Mrs. Coutant; she was called by her Indian name; I have forgotten it; the Indians accepted it; the treaty was read and signed at that time; then the money was brought on, and payments took place; the talk was with the Indians before the treaty; Indians then got drunk as soon as the treaty was over.

"I heard her talking and running after officers to help her get land; four or five; she got Indian chiefs, and four

or five white men, to go into Gen. Cass's office, to con-
sent to her having land: after she came out I asked her
if she got land, she said, "Yes, my son, my relations
have pitied me and given me a piece of land;" I met the
chiefs, who told me they had given her lands; they were
Kabamiscobe, Podagnass, old Neome, and Tonedogane, who
called Mrs. Coutant his aunt; I did not hear of any re-
serves for any little Indian girls; then four or five little
Indian children mentioned, who were intended as Jacob
Smith's legitimate children; I did not hear that Neome
asked for any reservation for any other than his tribe;
I understood they were half-breeds, but there were three
or four Indian⁷ women who lent their names to Jacob
Smith; the Crow claimed to have white blood; he had
always claimed to be a white man; it was suggested that
a reserve should be made for the Crow, but it should
be turned out for the Fisher boys; the Crow lived by
himself with his family, had no band, did not agree with
the other Indians. I never heard the Indians claim any-
thing for the little Indian girls; I understood that the
understanding was, that the special reservations were for
the half-breeds; the Crow was a good looking little fellow; he
looked like a half-breed; his manner of living was more,
like the French; he was proud to show French.

"I knew Lapparle who is here as a witness; he was
my hired man at the treaty; he brought my goods round
by water from Detroit; was son of one of Mrs. Coutant's
sisters; knew Mr. Reiley's sons; John and Jim were here;
Jim was my clerk; Mr. Bolieau was the father of Mrs.
Coutant; Reiley and Connor were the most active friends
of Mrs. Coutant; I knew Neome after the treaty; I was
acquainted with him in the spring of 1815; he never had
any children of his own as I knew of; Neome was simple
and ignorant, but good, kind, and honest; I knew Tonedo-
gane during the same time; he belonged to the same band;
I knew all the hunters of the band; I talked the Chip-
pewa language."

The counsel for the defendants then asked the witness the following questions, all of which were objected to, and the objection sustained:

Did you ever hear Neome say, after the treaty, that Madame Coutant got land?

After the treaty did you ever hear Tonedogane or Mixanene say anything about Madame Coutant getting land at the treaty?

From your intercourse with Neome's band during the seven years after the treaty (of Saginaw of 1819), are you able to say whether there was any common understanding or belief, whether Madame Coutant got land at the treaty?

During the seven years succeeding the treaty (of Saginaw of 1819), did you ever hear any of Neome's band claim that any reserves of land had been made at the treaty for any full blooded Indian children of that band?

The counsel for the defendants then offered to read in evidence the deposition of Okemos, an Indian, and four other witnesses (having first proved their, decease before the trial). This deposition was taken conditionally by the defendants on the 27th day of May, A. D. 1857, under the provisions of an act relating to depositions taken in this State, approved March 29th, 1848 (*Comp. L.* § 4287), before Robert H. Brown, a Circuit Court Commissioner for the county of Wayne. The following are copies of the notice of the time and place of taking the depositions, and of C. P. Avery's affidavit, verifying the notice.

"To George M. Dewey and Rufus J. Hamilton, of the city of Flint, in the county of Genesee, and State of Michigan.

You are hereby notified, that Joseph Campau, of the city of Detroit, in the county of Wayne, and Alexander McFarlane, of the city of Flint, in the county of Genesee, and State of Michigan, expect to be parties to a suit to be hereafter commenced in the Circuit Court for the county

of Genesee, in said State of Michigan, wherein you are
to be adverse parties, in which said suit, the title to the
following described premises will be in question [describ-
ing the premises as in the declaration].   And that the
testimony of the witnesses, hereinafter named, will be ma-
terial to the said Joseph Campau and Alexander McFarlane
in the defense of said suit ; that each  of the said wit-
nesses resides more than  thirty miles from the place of
trial of said suit, and that all of said witnesses are so
aged and infirm as to make it probable  that neither one
of them will be able to attend the trial:  You are there-
fore notified, that on the twenty-seventh day of May in-
stant, at the house of Nicholas Chovin, in the town of
Grosse Point, Wayne county, in the State of Michigan,
before Robert H. Brown, Circuit Court Commissioner for
said county of Wayne, at 10 o'clock A. M., the depositions
of the following persons as witnesses will be taken, to be
used in evidence on the trial of said cause, viz : Nicholas
Chovin and Angelique Chovin, of Grosse Point, in the
county of Wayne, in the State of Michigan ; also, Okemos,
alias Okeman, of Okemos, in the county of Ingham, in the
State of Michigan ; also, Gazette, or Gaget Louis Tremble,
of Milk River Point, in the county of Macomb, in the State
of Michigan ; also, Archange Laderoot, dit Siquen, of the
city of Detroit, Michigan.   You are also hereby notified,
that, upon examination of said witnesses, Louis   Moran,
Francis X. Cicotte, George Hunt, George T. Wendell and
Francis Drouillard will be severally sworn and used as in-
terpreters upon such examination.

You are further notified to appear before the said Rob-
ert H. Brown, Circuit Court Commissioner as aforesaid, at
the time and place above mentioned for the examination of
said witnesses respectively, and put such interrogatories as
you may think fit upon such examination.

You are also further notified that the testimony of said
witnesses, at the time and place aforesaid, will be taken

conditionally and perpetuated, and will be used in any and every suit or suits which may be. hereafter commenced, in which you, or either of you, or your representatives, or any one holding under or deriving title from you or them, may be party or parties, as well as in any and every suit in which the said Joseph Campau and Alexander Mc-Farlane, their grantees, devisees or heirs at law, representatives, or any one holding under or deriving title from them, may be party or parties.

JOSEPH CAMPAU, and<br>ALEX. McFARLANE,

*By Charles P. Avery, their Attorney and Agent.*

Dated this 19th day of ——, A. D. 1857, at Flint, in the county of Genesee, and State of Michigan.

STATE OF MICHIGAN, } ss.
  GENESEE COUNTY. }

I, Charles P. Avery, of the city of Flint, in the county of Genesee, and State of Michigan, being duly sworn, do depose and say, that I am the Attorney and Agent of the above named Joseph Campau and Alexander McFarlane, and that the above and foregoing is a true copy of the original notice for taking testimony conditionally, and to be perpetuated, as above set forth.

[Signed,]      CHARLES P. AVERY.

Sworn and subscribed before me, this 19th day of May, A. D. 1857.      W. O. DONAGHUE,

*Notary Public, Genesee County, Michigan.*"

The notice was served by one Brown, whose affidavit of service was attached.

The depositions show that the testimony of all the deponents was taken through an interpreter, and that neither the plaintiffs nor any one on their behalf appeared. The questions proposed were not written out, but the testimony was taken down in the narrative style. The plaintiffs objected to the reading of the depositions: 1st. That they are taken through an interpreter. 2d. That they are in the narrative

style.    3d. That no such notice was served as required by law. The Court sustained the objection.

The defendants then offered in evidence an act of Congress, approved June 15, 1844 (6 *U. S. Stat. at Large*, 913), authorizing a patent to be issued to Joseph Campau, of the said land, on proof being taken to show him to be the assignee of the heirs at law of Tawcumegoqua.— Also certified copies of the proofs taken under said act, and filed in the office of the Commissioner of the General Land office, it being admitted that Connor, who acted as interpreter at the treaty, whose testimony was taken, was dead. Also the patent issued under said act of Congress to Joseph Campau: all of which were objected to and excluded.

The evidence being closed, the counsel for the defendants requested the Court to charge the jury, that the presumption from the language of the treaty of Saginaw, of 1819, is that the individuals for whom special reservations are thereby made, including Tawcumegoqua, were, or were supposed to be, not full-bloods, but half-breeds, or persons of mixed white and Indian blood. That the same presumption also arises from a consideration of the policy of the General Government, as indicated by the Indian treaties and other public records of that period. That the same presumption arises from a consideration of the character, habits, and mode of life of the Chippewa Indians, including Neome's band, at the period when the treaty was made. That from the language of the treaty of 1819, of the despatch of Gen. Cass transmitting the treaty to Washington, the presumption is, that the Tawcumegoqua, for whom a special reservation was made, was, or was supposed to be, a half-breed, and not a full-blood Indian. That the treaty at Saginaw, of 1819, describes the special reservees therein named as 'Indians by descent.' This language, interpreted by the other public records and documents of that period, must be taken *prima facie* to import that they were half-breeds, and not full-blood Indians. All which requests were refused.

CAMPAU v. DEWEY.

.The Court, at the request of the plaintiffs' counsel, charged the jury that it was entirely a question of fact for the jury, as to who was intended by the treaty as the reservee.

The Court also charged the jury as follows:

"In determining the question of who was the reservee under the treaty, you will naturally look first at the treaty itself. The only light the terms of the treaty throw upon it is, that the person intended is Tawcumegoqua, with others, Indians by descent. What is meant by Indians by descent? The lexicographical meaning of descent, in the connexion in which it is here used, is "birth," "extraction," "lineage," "a single degree in the scale of genealogy." So that logically we should say the phrase Indians by descent, meant Indians by birth, Indians by extraction, Indians by lineage, by a single degree in the scale of genealogy; they are descendants of Indian parents, implying pure Indian blood, and we should be confined to this construction of the phrase, unless it derives a peculiar meaning from its relation to other parts of the treaty, or a legal significance from the Constitution, the statutes, or judicial decisions.

"In examining the treaty of 1819, I do not find the term Indian used in connection with any individual reservation. So that in looking at this treaty alone, we can not use the term Indian by descent in contra-distinction of Indian. In other treaties, I find individual reservations made to both pure blood and half-breed Indians, so that no light is yet thrown upon it. The question arises on the one hand, if the treaty contemplated pure Indians, why did it not say simply Indians, instead of Indians by descent? And on the other hand, if the treaty contemplated only half-breeds, why did it not say simply half-breeds, instead of Indians by descent? But may it not have a legal signification? Art. VII. of the Constitution of Michigan, in determining the qualifications] of Indian

voters, has the language: "And every civilized male in-
habitant of Indian descent, and a native of the U. S."
shall be a voter. Now, this language is practically con-
strued, and by universal consent, to contemplate both per-
sons of pure and mixed blood. Now, is it not the most
rational view to take of the term "Indian by descent,"
as used in the treaty, to suppose that for convenience sake
Gen. Cass used it to comprise both pure and mixed In-
dian bloods? Gentlemen, I can give the phrase no better
elucidation."

The jury returned a verdict for the plaintiffs, and de-
fendants brought error.

*S. T. Douglass, W. M. Fenton, J. G. Sutherland* and *C.
    P. Avery,* for plaintiffs in error:

The Court erred in overruling the several questions
propounded to the witness Noc-chic-a-me on his cross-ex-
amination. These questions were relevant. The main issue
on trial was whether a certain Indian girl under whom
the plaintiffs claimed, or a certain half-breed Indian woman
under whom the defendants claimed, both named Tau-
cumegoqua, was the reservee of the land in question by
the treaty. Such was the nature of the issue that what-
ever fact or circumstance tended to prove that one of
these persons was the reservee, tended to prove that the
other was not. And therefore whenever any witness on
either side testified in chief to any fact or circumstance
tending to show that one of these persons was the reser-
vee, the inquiry on his cross-examination into any fact
or circumstance tending to show that the land was re-
served for the other, was directly relevant to his testimony
in chief, and tended to discredit it. Noc-chic-a-me had
testified in chief that the Indian girl was the reservee of
a section of land, and had stated some circumstances tend-
ing to prove that such was the fact.

The object and tendency of the line of inquiry which

the counsel for the defense were pursuing when they were stopped by the Court, was to show that the testimony of the witness in chief was not true; that the half-breed woman and not the Indian girl was the reservee. The witness had stated that a full grown half-breed Indian woman came to the treaty from towards Detroit, desiring land, and that she got land — perhaps at Muscatawing (Flint). He had also stated that her father was a Frenchman. Thus far the testimony of this witness on cross-examination was in every particular consistent with, and tended strongly to prove, the theory of the defense that this woman was the reservee. But the witness said her name was Owashamegon. That name does not occur in the treaty. It was evident, therefore, that the witness was either mistaken in her name, or in the fact that she got land; or that she had several Indian names. The object and tendency of the further interrogatories propounded to the witness and overruled by the Court, was still further to identify this woman, and to bring out some additional circumstances tending to show that she was the reservee.

The relevancy to the issue, of the evidence sought to be elicited from the witness on cross-examination, was conceded. No objection was made on the ground that it was not relevant to the issue. If relevant to what the witness had testified in chief, it was no ground of objection that it also tended to establish the case of the defendants.

The defense was entitled to cross-examine Noc-chic-a-me as to any matter relevant to the issue, whether relevant to the subject matter of his examination in chief, or not.

The rule which prevails in England and in nearly all the states of this Union, and which we believe to have prevailed here up to a recent period, is, that when a competent witness has been called and examined by one party to any material fact, he is thereby made a witness for all purposes, and may be cross-examined to the whole

case :— 1 *Greenl. Ev.* § 445, *and cases there cited ;* 2 *Ph. Ev.* 611, *C. & H.* (*last ed.*) 895, 899; 7 *Cow.* 238 ; 2 *Wend.* 166 ; 2 *Wend.* 483 ; 17 *Pick.* 490, 498 ; 2 *Gray,* 262 ; 26 *Vt.* 123, 135 ; 32 *Geo.* 154, 159; 18 *Geo.* 573 ; 29 *Ala.* 457 ; 24 *Ala.* 527 ; 32 *Miss.* 405, 427 ; 1 *Mart. La.* 202 ; 12 *Lou. An.* 826 ; 11 *Texas,* 127.

The ruling of the court below was based upon the decision of this court in *People v. Horton,* 4 *Mich.* 67, 71, 81, 83, and is a misapplication of the rule there laid down, namely: " That a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his dirèct examination; and that if he wishes to examine him as to other matters, he must do so by making the witness his own, and calling him as such in the subsequent progress of the cause" (1 *Greenl. Ev.* § 445). Until that rule was apparently approved by our Supreme Court in the case referred to, it had the sanction of no direct adjudication, although it had been asserted by Ch. J. Gibson in two cases in Pennsylvania, and by Mr. J. Story in the Supreme Court of the United States, in a case which originated in Pennsylvania. [Counsel in this connection examined and commented on the cases in 16 *S. & R.* 72 ; 6 *W. & S.* 75 ; 14 *Pet.* 461 ; 7 *Cush.* 547.]

Whatever may have been said by learned judges in delivering their opinions, the utmost extent of the doctrine which the *People v. Horton* and other kindred cases tend to establish is this : that whether a party shall be allowed to cross-examine his adversary's witness to *the whole case,* at once, and before he leaves the stand, or shall be required to *postpone* the examination of the witness *as to matter not relevant to his direct examination,* until a subsequent stage of the cause, and whether as to such new matter the party shall be allowed to examine the witness by leading interrogatories, rests in the sound discretion of the court before whom the case is tried, and that the decision

of the court in the exercise of that discretion is not subject to review on error.

We prefer the English rule. It has been sanctioned by long experience, and whatever may be its defects in theory, is practically the best. It is doubtless open to the criticisms pronounced upon it by Ch. J. Gibson, but the defects he points out have been found to lead to no serious practical inconvenience or injustice. It is the only rule which is not manifestly inconsistent with the nature of the oath which is administered to a witness, and of the obligations which that oath imposes. And in our judgment it is the only rule which leaves the course of cross-examination sufficiently free and unobstructed to make it effective for the attainment of the truth in respect to the matters in controversy.

The rule laid down in *People v. Horton*, however plausible in theory, is exceedingly mischievous in practice. It is altogether too nice and refined for practical application.

Under it, in most litigated cases, questions of relevancy, often of the most difficult and perplexing nature, are perpetually springing up during the progress of the trial, occupying the time of the court, and distracting the jury with their discussion; and each of these questions must be decided by the presiding judge upon the spot, at the peril of a reversal of the judgment, to the great injury of the party if from misrecollection of the witness's testimony in chief, misapprehension of the nature of the issue, or any other cause, he commits an error, although the error, if in the way of overruling an objection, in most instances works no practical injustice.

But this is not all: the worst effect of the rule is that it greatly impairs the efficiency of cross-examination.

If there are any evils in the practical working of the English rule of sufficient magnitude to call for its modification or abandonment, they are all avoided, as well as the

evils of the rule laid down in *People v. Horton*, by adopting the rule that whether a party shall be allowed to cross-examine his adversary's witness as to the whole case, or by leading questions, rests in the sound discretion of the court.

It may be said that if the last mentioned rule is adopted, no error can be assigned upon the decisions of the Court overruling the questions propounded to Noc-chic-a-me.

But the bill of exceptions shows the questions were overruled as legally incompetent, and that the court exercised no discretion as to whether they should be allowed or not. In such a case error will lie: 20 *N. Y.* 81.

The questions overruled were proper for the purpose of testing the extent of the witness's knowledge and recollection of the events of the treaty.

*M. Wisner, M. E. Crofoot* and *J. Moore*, for defendants in error:

Were the questions propounded proper upon cross-examination, *if they did not relate to the examination in chief*, merely because they might relate to the issue? We think they were not, and that much the better rule is the one adopted by Greenleaf in his work upon evidence, and by our own Supreme Court. And the counsel for the plaintiffs has admitted, that theoretically and logically, considering the ordinary rules of evidence, it is the rule that any legal mind trained upon elementary principles of law would naturally adopt: but he says *practically* there are many objections to it, and that he prefers the English rule.

But our Court is not alone in laying down this rule. The following authorities show partially to what extent it has been adopted in other States:—14 *Ark.* 556; 4 *Iowa* (*Clarke*) 478; 5 *Cal.* 450; 2 *Dutch.* 463.

If this rule is to remain unchanged, the next inquiry is, were the questions relevant to any matters called out upon the examination in chief? To ascertain this, we must

refer; 1st. To the issue made by the record: 2d. To the proofs and the case as it then stood, to wit: *when the questions were asked.*

To ascertain this, we must look at the printed case at this point. The testimony of Nochicame was the first evidence offered by the plaintiffs below, after their record evidence. All that had been proved by the witness was, that he was at the treaty, what he saw there, what he heard there, and who got lands at the treaty; and in his direct examination, he had not at all alluded to the *half-breeds from Detroit.* This was new matter, called out by the defendants upon cross-examination; and this perhaps they had a right to, as showing that there were others got land at the treaty than those the witness mentioned in his direct examination.

But there was nothing in the case at *that time* to show, either that there was, or ever had been, two Tawcumegoquas, or that this Owashamegan ever bore the name of Tawcumegoqua; nor was there any claim made by counsel at that time that she ever bore the name of Tawcumegoqua. How then can it be said that to prove that this Owashamegan was any relation of Tonedagane was relevant to the direct examination? The witness had not mentioned *Tonedagane,* nor did the counsel state, either that he expected to show that this Owashamegan ever bore the name of Tawcumegoqua, or that they claimed title under this old half-breed Owashamegan.

What part of the evidence in chief shows that it became relevant thereto to show to what band this Owashamegan belonged? Her name had not been mentioned by the witness in chief — her residence, nor her ancestors — nor had the slightest allusion been made to her or her ancestors, or to the bands to which they or any of them belonged.

And here we might add that we can hardly perceive how these questions were, at that time, even relevant to the issue.

CAMPAU v. DEWEY.

But it can hardly be claimed that the object of the proof then sought, was what they now assert. They made no claim, upon the trial, by proof in defense, from their witnesses or ours, that this Owashmegan ever bore the name of Tawcumegoqua, or that they claimed title through her.

In determining the question now under consideration, whether these questions were relevant to the direct examination, some aid may be gathered from the authorities we have cited, as well as from *Dillin v. People*, 8 *Mich.* 357.

CHRISTIANCY J.:

The first objection taken by the plaintiffs in error is, that it was incompetent to change the venue from the county of Genesee, in which the premises are situated, to the county of Saginaw; and, therefore, that the Circuit Court of Saginaw county had no jurisdiction to try the cause.

The action of ejectment being local at common law, this objection must prevail, unless the statute has given the power to change the venue. But we think the statute has given that power. Section two of chapter 103 Revised Statutes of 1846, prescribes the place of trial of all issues of fact in the Circuit Courts. The first clause of the section is in these words: "Issues of fact *joined in such actions* shall be tried in the proper county as follows:" and though the words, "joined in such actions," might seem at first view to confine the provisions to issues joined in a Probate Court — these being the only issues previously mentioned in section one — yet the various actions mentioned in the three subdivisions which immediately follow, are all actions of which the Probate Court had no jurisdiction, and issues in which could not be joined in that court. The provisions of the section can not, therefore, be confined to issues of fact joined in the Probate Court,

without making the whole section repugnant and nugatory. This section was amended in 1847 (*L. of* 1847, *p.* 172) by striking out the words, "joined in such actions." But this amendment, though proper enough, was not necessary, and, we think, had no other effect than to express in words what the section, without the amendment, must have been construed to mean. With or without the amendment, we think the issues mentioned in the first line of this section (two) include all the issues of fact joined in any of the classes of cases mentioned in the three following subdivisions of the section. The entire section reads as follows:

"Issues of fact joined in such actions, shall be tried in the proper county, as follows:

1. Actions for the recovery of any real estate, or for the recovery of possession of real estate, actions for trespass on land, and actions for (of) trespass on the case for injuries to real estate, shall be tried in the county where the subject of the action shall be situated.

2. Actions of trespass for injuries to the person, and actions on the case for injuries to the person, or personal property, shall be tried in the county where the cause of action arose.

3. Actions of slander, for libels, and all other actions for wrongs, and upon contracts, shall be tried in the county where one of the parties shall reside, at the time of commencing such action; unless the court shall deem it necessary for the convenience of parties and their witnesses, or for the purposes of a fair and impartial trial, to order any such issues to be tried in some other county; in which case the same shall be tried in the county so designated."

It is urged that the clause beginning with the words "unless the court," &c., and giving the power to order "issues to be tried in some other county," being contained in the third subdivision, and in immediate juxtaposition with the class of actions in that subdivision, and separated

from it only by a semicolon, should be construed as con-
fined to the cases mentioned in that subdivision.    Look-
ing only to the grammatical arrangement, and the punctua-
tion, there might be some plausible ground for this con-
struction; but, on the other hand, the two preceding sub-
divisions are separated from the third only by a colon;
so that even on the score of punctuation, the clause giv-
ing the power in question may be correctly enough con-
strued as extending to, and qualifying, all the subdivisions.
But punctuation alone is a very unsafe guide in constru-
ing an act of the Legislature; it is often much or entirely
neglected by the person who drafts the provision, and
generally unnoticed by the great body of the members;
it depends much upon the enrolling clerk, and perhaps
quite as much upon the printer.    The object of the pro-
vision, when it can be clearly ascertained, furnishes a
much safer guide.    Here the object is plainly expressed on
the face of the statute;  it was "for the convenience of
parties or their witnesses" or "for the purposes of a fair
and impartial trial."    Now the action of ejectment, and all
the other actions enumerated in the first and second sub-
divisions, are as clearly within this object, as those men-
tioned in the third; and the provision was quite as ne-
cessary for the former as for the latter.    The words* of
the provision strongly confirm this view: the power given
is "to order *any* such issues to be tried in some other
county."    Now the word, "issues," is not found in the
first, second or third subdivisions, but only in the general
provision at the beginning of the section, where, as already
shown, it extends to all issues of fact joined in the Cir-
cuit Courts: and the words, "any such issues," we think
have the same extent of application.

Act No. 94 of the laws of 1853, amending the second
section of chap. 103 Rev. Stat. of 1846, did not, we think,
in any respect, alter or modify the power given in that sec-
tion to change the venue.    The whole scope and object of

the amendatory act was to strike out subdivision two of the original section, so as to leave the actions therein mentioned to fall within the next subdivision. In making the amendment it was necessary, under the Constitution, to re-enact the section as amended," and in doing this it is very obvious, the person who drew the amendatory act copied directly from the Revision of 1846, as there printed, and thus overlooked the amendment of 1847. But, as we have already shown, the amendment of 1847 did not alter the effect of the original section.

Section ten of the act of 1851, "to define the limits jurisdiction and power of the Circuit Courts" (*Laws of* 1851, *p.* 245) also gave full power, upon good cause shown, "to change the venue in any case pending therein," and made full provision for carrying the power into effect. It is unnecessary to determine whether this act, as a full and later provision on the same subject, had the effect to repeal the provision in the Revised Statutes giving the power to change the venue. If it had this effect, it also of itself gave full power to do the same thing: if it had not this effect, then the provision in the Revised Statutes giving the same power remained in full force. Nor, for a like reason, is it necessary to determine what effect the law of 1853 had upon the law of 1851. If it did not repeal or modify the law of 1851, then the law of 1851 continued to authorize the change of venue; if it did repeal it, it also made a sufficient provision for the exercise of the same power.

The act of 1855 (*Laws of* 1855, *p.* 273) cited on the argument, we think has no bearing on the question. It provides only for the transfer of causes from one circuit to another, where the Judge of the circuit in which the case is pending is incompetent, for special reasons therein mentioned, to hear the case, or even properly to hear the motion for its transfer. It has a different scope and object from all the other provisions above referred to.

CAMPAU v. DEWEY.

The second ground of error, urged upon the argument, is the rejection of the deposition of Okemos and four other witnesses, taken conditionally before the suit was brought, and, as is claimed, in pursuance of the "act relating to depositions taken within this State," approved March 29, 1848: *Comp. L.* 1171 *et seq.*

These depositions were objected to and rejected in the court below upon three distinct grounds:

1st. That the depositions were taken through an interpreter.

2nd. That they were in the narrative style, without having the questions and answers written out, and

3d. That no notice was served on the plaintiffs (below) as required by the statute; the notice served having been verified by C. P. Avery's affidavit and served by Brown.

The first and second objections we think are untenable. We see no reason to doubt the power of the commissioner to swear an interpreter under this statute; especially when (as in this case) the notice declares the intention of swearing interpreters, and gives their names.

As to the taking of the testimony in the narrative form, the act expressly provides (§ 8) that the examination may be made upon verbal or written interrogatories. As no interrogatories appear with the depositions, we are to infer that the witnesses were examined orally; and though it might be more satisfactory if the questions were stated at length in the depositions, we see nothing in the statute which, by fair construction, would make it imperative, especially when not requested by either party.

But the third objection is not so easily disposed of. The statute, after providing for a notice to be issued by a justice, commissioner or judge, further provides, in the alternative, that "such notice may be given by such party, and served upon such adverse party without any such direct agency of such justice, commissioner or judge." If the suit had been pending at the time this notice was

CAMPAU v. DEWEY.

given, and Mr. Avery had been the attorney of record, the notice, so far as this point is involved, might have been regarded as given by the party within the meaning of the statute. The defendants below would then have been bound by his acts, and the record would have been conclusive of his authority, which the defendants could not have repudiated. But, no suit having been commenced, there was no attorney of record: and should a notice thus signed be held good, this difficulty might arise': if the testimony was found unfavorable to the party, he might deny the authority of the attorney, and exclude the evidence, or put the other party to the proof of the authority, a fact which it might be difficult for him to show. For myself, I am inclined to look upon the affidavit of Avery attached to the notice, as it regards the question of authority, as entirely extra judicial.

But it is unnecessary to decide upon the validity of the notice upon this ground, as we are all of the opinion that the depositions were properly rejected upon another ground. This statute authorizes testimony to be taken in the absence of a party to be affected by it, if he fail to be present in compliance with a notice verified and served in the particular mode specified by the statute. No latitude of interpretation can therefore be indulged, which might dispense with even the slightest formality touching the notice, its verification or service, which the Legislature have seen fit to impose. And, before testimony taken in the absence of a party can be received against him, it is incumbent upon the courts to see that he was required to attend, and has been put in default by the proper notice, verified and served in all respects as the statute requires.

Admitting an original notice to have been properly signed, there was no proof of any proper service upon the plaintiffs below.

The third section, after having provided for a notice to be issued by a justice, commissioner or judge, uses the

9 MICH.—2B

following language : " or such notice may be given by such party, and served upon such adverse party, without any such direct agency of such justice, commissioner or judge."

The plaintiffs in error contend that this is a full and complete provision in itself, for the service of the notice, when given by the party; and this view would be correct if there were no subsequent provision prescribing the manner of service of this species of notice. He insists there is no such subsequent provision: that sections four and five refer only to the notice issued by the officer, and not to that given by the party. Section four is in these words : "The *said notice* may be served on the agent or attorney of the adverse party, and shall have the same effect as if served upon the party himself."

We can not entertain a doubt that this section, following as it does directly after the provision for both kinds of notice, applies equally to both. The reason and the language apply equally to both. Section five, immediately following, commences as follows. "The notice shall be served by delivering an attested copy thereof to the person to be notified, or by leaving such copy at his place of abode, if served by an officer authorized to serve a subpœna, and when served by the party, by delivering a true copy of such notice verified by the affidavit of the party serving the same." We think this was equally intended to apply to the service of both kinds of notice. But it is contended that service by an officer of " an attested copy" is only appropriate to the notice issued by the commissioner, &c., which is in the nature of process, and that such a provision is inapplicable to a notice issued only by the party. It may have been more customary to provide this kind of service for papers officially issued. But it is equally competent and, for aught we can see, equally proper, to provide this as one mode of service of a notice issued by the party, as well as when issued by an officer, under a statute which gives the same validity and effect to both forms

of notice. The question here turns principally upon the mode of verifying the copy served. If not served by an officer it is verified by the affidavit of the party serving it: if served by an officer, it is attested by him under his oath of office: in each case it has the sanction of an oath.

The counsel for the plaintiffs in error insists that an examination of the previous statutes of this State, and the statute of Massachusetts, portions from both of which seem to have been copied into the act of 1848, will tend to sustain the construction for which he contends: we have carefully examined the statutes referred to, but can draw no such inference. The Revision of 1838, so far as it has any bearing, we think sustains the view we have adopted: and, as to the other statutes referred to, it does not follow that the same language, found in a new connection in the act of 1848, must have the same effect, and the like construction, as in the act from which it was taken. We think in the present statute the effect of the language has been modified, and intentionally modified, by the new order and context in which it has been placed.

But these former statutes can have little, if any, bearing, for another reason. Where there is no ambiguity there is no room for construction. The statute of 1848, upon this point, is entirely clear and unambiguous upon its face.

The reference to former statutes could only serve to create, by construction, an ambiguity where none existed before, for the purpose of justifying a construction which should remove the ambiguity.

The fifth section, then, required the copy to be "verified by the affidavit of the party serving the same;" and we think the word party is here used in the same sense as in the previous section three, and, when the service is not made by an officer, the copy must be verified by the affidavit of the same party who gives the notice — the party to the suit, or, at least, by his attorney of record

in a pending suit, otherwise the statute would have used the terms "affidavit of the *person* serving the same."

We think, therefore, the depositions were properly rejected.

The next question arises upon the decision of the Judge overruling the following questions, propounded by the defendants to the plaintiffs' witness, Noc-chic-a-me, on his cross-examination, viz: "Was this Owashamegan any relation to Tonedogane?" and, "What band did her mother belong to when she was born?"

To understand the nature of the question here presented, it is necessary to look to the nature of the main fact in issue, and the manner in which it was presented upon the evidence.

The plaintiffs claimed title under a reservation, in the nature of a grant, made by the treaty of Saginaw of September 24, 1819, with the Chippewa nation of Indians, to a person described in the treaty by the name of Taucumegoqua, and to her heirs. It was necessary for the plaintiffs to show, not only that the person under whom they claimed bore the name of Taucumegoqua, but to identify her, as the person intended as the grantee designated by that name in the treaty. The treaty simply gives her name, without any other description by which she can be identified, except that she, with ten other reservees mentioned by name in the same clause, are described as "Indians by descent." The testimony of Noc-chic-a-me, as well as that of other witnesses on the part of the plaintiffs, on the direct examination tended to show both the existence of the Taucumegoqua under whom the plaintiffs claimed, and her identity with the person described by that name in the treaty; still this was not conclusive. Among Indians, as well as whites, there may be several persons known by the same name, and the same person may be known by different names. The latter fact appears upon this treaty as to "the Crow" and both, by

comparing the treaty with the plaintiffs' evidence in this case.

Under a treaty like this, which gives no designation of the person but the name, the question of identity is frequently one of peculiar difficulty, and has led to much litigation. This is not the first case of the kind under this very treaty. See *Stockton v. Williams*, 1 *Doug. Mich.* 546. The difficulty is inherent in the nature of the case, and its causes numerous and obvious: the difficulty of expressing the uncouth sounds of Indian names by the English alphabet, the inability of the Indian to read or write, and, therefore, to detect or correct an error committed by others, the informal and often hasty manner in which these treaties are made, the uncertainties and imperfections incident to the proceedings of a council carried on through an interpreter, and the facilities offered after the lapse of many years and the death of most of the actors, for the manufacture of fictitious cases, by the mere substitution or fabrication of the name of some obscure Indian or half-breed long since dead. These considerations seem to have been appreciated by the counsel for the plaintiffs below; and several discrepancies appeared between the names of reservees mentioned in the treaty and those stated by the plaintiffs' witnesses. The witnesses mentioned Owanonaketoqua and Ojibwok, as reservees who got land at the treaty, while neither name appears in the treaty itself, the nearest approach to them in the treaty being An-na-ke-to-qua and Checkbalk, which, judging from the names only, would hardly be suspected of identity. The plaintiffs, therefore, were not content to leave their case to stand solely upon the direct evidence tending to show the name and identity of the person under whom they claimed; but they went further, and enquired, not only as to this particular reservee, but generally as to the other reservees under the treaty; and they elicit the names and family connections of several others, and their relationship

to the chiefs. Noc-chic-a-me, on his direct examination, was asked; generally who were the reservees under the treaty. This question and the other enquiries just alluded to were pertinent on two grounds : 1st. They tended to elicit the fact, whether there was any other person among the reservees, known by the name of Taucumego-qua, or who might · have been intended as the reservee, and to preclude, as far as possible, the idea of any mistake as to her being the person intended.     2d. The questions tended to show the extent of the witness's knowledge of the persons and transactions about which he testified, and to test the accuracy of his memory. By showing his familiarity with the persons and events alluded to, and a clearness of memory, his credit with the jury would be increased; while that credit would be diminished, if his knowledge appeared limited and his memory confused.

By this course of inquiry, the plaintiffs had made the identity of all the reservees a question in some degree pertinent to the case, if indeed it were not so before; and opened this whole field of inquiry to cross-examination by the defendants; for, if the plaintiffs could inquire into the names and family connections of the various reservees, for the purpose of strengthening the inference of identity, and to gain a higher degree of credit for their witness, by showing extensive familiarity with, and a clear memory of, the facts, the defendants must be allowed to cross-examine him at large upon the same general subjects, for the purpose of weakening the inference from his direct evidence, and to diminish the credit otherwise due to his testimony, by exposing the imperfection of his knowledge and the confusion of his memory.

The witness Noc-chic-a-me, on his cross-examination had already stated among other things, that he "knew some half-breeds at the treaty trying to get land." "I saw (he says) some half-breeds that came from towards Detroit, women; they came desiring lands: O-wash-a-me

gan, a half-breed Indian woman, got land at the treaty; I don't know how much or where situated; perhaps it might be at Muscatawing (Flint); she was a grown person." This answer is followed up by the counsel for the defense by the questions now under discussion, which were separately put and severally overruled, viz: "was this O-wash-a-me-gan any relation to Tonedogane?" and "what band did her mother belong to when she was born?"

These questions were severally overruled on the single objection, and on the naked ground, that they were irrelevant to the subject matter of the direct examination. This was not a mere postponement of the cross-examination to a subsequent stage of the cause — a matter always within the sound discretion of the court, and upon which error could not be assigned — but an absolute and final denial of the right to cross-examine the witness, at all, on the matters to which the questions related. This, therefore, is a question of law, and not of discretion, and the ruling of the court is subject to review on error.

In this ruling, the court below doubtless intended to conform to the rule laid down by the majority of the court in *People v. Horton*, 4 *Mich.* 67. But, admitting that rule to be correct, I am strongly inclined to the opinion that it would not sustain the ruling of the court in this case. The direct examination of the witness, by the plaintiffs, extended to all the individual reservees under the treaty. He was asked "to whom were individual reservations made?" It is true he does not give, in answer to this question, the names of all mentioned in the treaty; but he mentions eight as reservees, without saying whether these were all; but this does not alter the extent of the question. But notwithstanding the case of *People v. Horton*, I think the questions proposed were admissible both upon principle and authority, whether the examination in chief had extended to all the grantees, or not. The plaintiffs had certainly inquired into the names and relationship of several of the other reservees:

and, as already shown, this course of inquiry, though not absolutely obligatory upon the plaintiffs, was pertinent and admissible, as tending to strengthen the evidence of identity, and showing the extent of the witness's knowledge, and the clearness of his memory. And, as the witness, on his cross-examination, had already stated that O-wash-a-me-gan got land at the treaty, it was just as competent for the defendants to pursue the same inquiry as to her, for the pur pose of weakening, if they could, the inference of identity which would result from his evidence in chief, and to diminish the credit of the witness, by exposing ignorance, mistake or defective memory. It was especially important to pursue this inquiry in reference to O-wash-a-me-gan, for another reason. The witness had stated that she got land at the treaty: and no such name appears in the treaty, nor any name bearing the most distant resemblance to it. The witness, therefore, must have been mistaken, as to the fact of her getting land, or she must have been known and described in the treaty by some other name; and this name might as probably turn out to be Taucumegoqua as any other of the names mentioned in the treaty. Until she was fully identified, therefore, it was impossible to know to whom the witness referred by that name, or whether he was mistaken in the fact to which he had testified.

But the right of the defendants to enter upon the proposed course of cross-examination rests upon a much broader principle, and would, I think, have been clear, though the examination in chief had not extended to any other reservee except Taucumegoqua.

As the conclusion at which I have arrived upon this point is directly in conflict with the rule adopted by the Court in *People v. Horton*, I propose to examine the question at some length, as it relates to the present case: first, upon purely logical principles, without reference to any authority; and secondly, to examine the authorities upon which that decision purports to rest, and to show

that those authorities do not warrant the rule as applied in that case.

When a witness is called and examined by a party, the law and the oath impose the obligation to state the whole truth — all the facts within the knowledge of the witness bearing upon the question in controversy upon which his testimony is sought. The witness may be cognizant of some facts which, considered without reference to others equally within his knowledge, would tend strongly to prove the issue in favor of the party calling him; while, at the same time, there may be other facts equally within his knowledge, which, considered without reference to the former, would have an opposite tendency, or which, considered in connection with them, would explain away or modify the former, and give a very different effect to the whole. Should a witness in such a case disclose only that class of facts which operated in favor of the party calling him, his testimony, though true in the detail, would be false in the aggregate, and have all the effect of intentional falsehood; and, if aware of the nature of the controversy in which he is called to testify, he would be guilty of perjury, as much as if he had wilfully falsified the facts stated by him; and this whether he were cross-examined or not. It is the disclosure of the facts known to the witness (bearing upon the issue), *as a whole,* which the law seeks. And a direct examination which should be perfectly fair, would, in such a case, disclose both classes of facts, and present the witness's knowledge as a whole. But the party calling the witness may so adroitly direct the examination in chief as to disclose only that class of facts which tend to establish the issue in his favor, and to conceal those which would destroy or modify their effect. And, as courts (from their ignorance of the extent of the witness's knowledge, and of the plan arranged by the party calling him) has no means of enforcing the perfect fairness of a direct examination, the law has given to

the opposite party the right to cross-examine the witness, for the purpose, among others, of bringing out the facts thus concealed, which tend to explain away or modify the effect of those stated on the direct examination, or to rebut the inference which would otherwise result from them. Such facts, thus elicited on cross-examination, constitute, in the nature of things, a part, and a necessary part of those stated on the direct examination; and must be considered and treated as a part of the testimony in chief, the effect of which they go to weaken or modify: and, hence, all such facts thus elicited, in connection with those disclosed by the examination in chief, must be treated as testimony given on the part of the party calling the witness.

But these remarks must be confined to such facts on cross-examination as go to controvert so much of the plaintiffs' case as the direct testimony tended to prove. The party against whom the witness is called has no right (and I think should not have, under any rule) on cross-examination to go into an independent or affirmative case on his own part, which does not controvert the prima facie case which the direct testimony tended to prove, but seeks to meet it by matter substantially in the nature of confession and avoidance; as to the facts constituting such a defense, the onus of proof is on the defendant.

Nor should the witness be cross-examined generally upon the merits, when the direct examination has been confined to mere preliminary or formal proof, such as the execution of a paper, in which case the cross-examination should be confined to such preliminary matter, as (in the instance just put) to facts bearing upon the execution, which the testimony in chief tended to prove; for the contents of the paper can not logically be considered a part of the witness's testimony. When proved, it is the paper which speaks, and not the witness.

It is further essential to the developement of the true

logical idea of cross-examination to observe, that it is the *tendency* of the direct examination which determines the *subject* of it, as a *test* of *cross*-examination: for example, it is that essential or ultimate fact in the plaintiff's case which the direct examination tended to prove, which determines the logical limits of the cross-examination, and not merely the particular minor facts and circumstances tending to the proof of that fact. As the plaintiff is at liberty to adduce any number of these particular or secondary facts, however disconnected with each other, so that they tend to the proof of the essential resultant fact which he is bound to establish, so must the defendant be equally entitled, on cross-examination, to elicit any number of such particular facts, as may tend to disprove that resultant fact, or to weaken the tendency, in its favor, of the particular facts stated on the direct examination.

And where two or more main facts are essential to the plaintiff's prima facie case, such as the title of the plaintiff, and conversion by defendant, in trover, and the direct examination has been confined to matters tending only to the proof of one of these main facts, the defendant should not be allowed, to cross-examine as to the other; as this would have no relation to the evidence in chief, and could not therefore, in any logical sense, be denominated a *cross*-examination. Such, I think, are the purely logical principles of a cross-examination.

To apply these principles to the case before us. The main question in controversy was the identity of the person under whom the plaintiffs claimed, with the person described in the treaty by the name of Taucumegoqua. The burden of proving this identity rested with the plaintiffs throughout the cause. This fact was necessary to constitute a prima facie case for the plaintiffs, and, without it, the defendants needed no defense. It was a fact, then, which belonged to the plaintiffs', not the defendants' case. The defendants were not bound to show title under any

reservee: they had a right, if they chose, to rest their case upon a want of title in the plaintiffs. The direct testimony of this witness had been introduced for the purpose of proving this identity, and such was its tendency. The fact of identity (involving the question who was intended by a certain name in the treaty) though the real question in controversy, can hardly be said to be susceptible of direct proof: it was one to be inferred from other facts to be proved. The witness, on his direct examination, had testified to several distinct matters of fact, none of which was the real fact in controversy, nor, of itself, directly any part of the issue. But these particular facts had been called out by the plaintiffs for the purpose of establishing the main fact in controversy, as an inference resulting from them. The defendants, therefore, had just as clear a right, on cross-examination, to call forth any other particular facts, within the knowledge of the witness, which would tend to weaken or destroy that inference, as they could have to show, by his cross-examination, that he had falsified or mistaken any particular fact stated by him. The effect of either course would alike operate to weaken or destroy the premises from which the inference of identity resulted. And, though the proposed cross-examination called for particular facts not called for on the direct examination, yet they were facts which related to the *same subject matter*, and bore exclusively upon the *same main fact*, identity, to which the whole examination in chief was directed: facts, the omission to state which, if within his knowledge, gave to his direct testimony the injurious effect of false testimony; and whether the facts *were* within his knowledge could only be known by the inquiry.

From the peculiar nature of the question, any thing which tended to show that some other person was the reservee intended by the treaty, would also tend to show that the person under whom the plaintiffs claimed was

not. It is therefore a mistake to suppose that this could only be shown for the purpose of proving title in the defendants. It would defeat the title of the plaintiffs; and this was all that the defendants were required to do. The witness, Noc-chic-a-me, may have known the fact that there was another person present at the treaty by the name of Taucumegoqua. He may have known that Owashamegan was known by that name, or that she was the same person known as Madame Coutant, and shown by other witnesses to be known by the name of Taucumegoqua; any of which facts would have had a tendency to weaken the inference of identity to be drawn from his testimony in chief. And I can not doubt the right of the defendants to have called out either of these facts by a direct question on cross-examination; and yet the direct question would have been no more relevant to the direct examination, than the indirect questions having the same object in view; and I do not think the indirect form in which the questions were put, at all objectionable on cross-examination; as this is often the only way in which a cross-examination can be rendered effectual. (See remarks of Mr. Evans cited *infra*). I can not well see how the Court could fail to discover the object of the questions. It must have been obvious that the defense could only meet the inference of identity arising from the direct testimony, in one of two ways: either by showing that the particular facts, stated on the examination in chief, were untrue, or that, notwithstanding their truth, there was another person by the same name who was the grantee intended. One of these ways was as competent as the other. The course of the examination had clearly shown that the identity of the person under whom the plaintiffs claimed was not admitted; and the form of the questions overruled, showed clearly enough, that the object of the cross-examination was to elicit evidence tending to weaken the inference of identity in one or the other of the modes mentioned; and it would not seem to have

required much foresight to discover that the questions looked to contesting the identity, by showing another person present at the treaty, by the same name, for whom the reservation was intended. This clearly appeared to be the object, when the defendants introduced their own testimony. But it is insisted on the part of the defendants in error that, though the questions might have been relevant in fact, their relevancy did not clearly appear at the time the questions were put, and that, to enable the defendants below to assign error for their rejection, they were bound to show to the court how they proposed to render them relevant. On the direct examination, it is true, if the relevancy of a proposed inquiry does not appear, the court have a right to call on the counsel to state the object of the proposed testimony, and the manner in which it is to be made relevant: and the court may, in the exercise of its discretion, require a particular statement of the substance of the evidence, in connection with which the proposed inquiry is to be rendered pertinent, and if refused, may reject the evidence. Whether on a direct examination the court have a right to reject the evidence without calling for such statement, it is unnecessary to decide. But on a cross-examination the rule as to relevancy is not so strict, and it would be a very unsafe rule which should allow the court to reject evidence which may in any manner be rendered material, because the party proposing it has not volunteered to precede it with a statement of its precise object, and of the other facts, in connection with which it is to be rendered material. The court may, doubtless, in its discretion, when a question is asked on cross-examination which he thinks *can not be rendered* pertinent, require an intimation of its object, and reject the evidence if not given. But this is a discretion which should be very sparingly exercised, and nothing further than a bare intimation should generally be required. For, in many cases, to state the precise object of a cross-examination would be to defeat it.

CAMPAU v. DEWEY.

The observations of Mr. Evans on this point (2 *Evans Pothier on Ob.*, 2 *Am. Ed.* 205) are entirely pertinent.

"The benefits of a cross-examination are sometimes defeated by the interposition of the court to require an explanation of the motive and object of the questions proposed, or to pronounce a judgment upon their immateriality. Whereas experience frequently shows that it is only by an indirect and · apparently irrelevant inquiry that a witness can be brought to divulge the truth which he had prepared himself to conceal: the· explanation of the motives and tendency of the question furnishes the witness with a caution that may wholly defeat the object of it, which might have been successfully attained if the gradual progress from immateriality to materiality was withheld from his observation." I think, therefore, that where a question on cross-examination has been overruled by the court on the ground of irrelevancy (as in this case) without asking from counsel any intimation whatever of its object, it is error, if it appear from the whole record that the inquiry could in any manner have been made relevant. But its relevancy in this case sufficiently appeared I think, at the time it was offered, without any further explanation than was already furnished by the issue and the previous course of examination.

The logical rule governing the relevancy of cross-examination, as I have endeavored to explain it upon principle, is, I am inclined to think, substantially the same as that intended to be recognized by the authorities cited by the court in *People v. Horton:* and I can not resist the conviction that that rule was misapprehended by the court. The rule relied upon, it is true, implies that a defendant, on cross-examination of a plaintiff's witness, is not at liberty to inquire into facts which properly constitute matter of defense: but I think the court failed to discriminate between what constitutes a part of the plaintiff's case, and what a part of the defendant's defense.

Where the defense assumes substantially the form of confession and avoidance, and, without controverting the facts stated on the direct examination tending to show a prima facie case on the part of the plaintiff, seeks to avoid their effect by a new and independent state of facts, the defendant can not be allowed to enter into such a defense on cross-examination; because it would not tend to contradict or modify any fact stated on the direct examination; and the facts constituting such a defense, tending, as they would, to a different point from those stated on the direct examination, would have no logical connection with them, and could not tend to weaken, explain or modify, his testimony in chief. But when a defendant, on cross-examination of a plaintiff's witness, enters upon an inquiry calculated only to contradict or weaken facts or inferences from facts stated on the direct examination, and which were necessary to support the plaintiff's prima facie case, he can not, I think, properly be said to enter upon his defense, within the meaning of this rule. The purpose of such an inquiry is to show that the plaintiff has not made a case which calls for any defense; and the testimony sought thus to be elicited relates to the plaintiff's rather than to the defendant's case. To apply the rule in question to such a case, and refuse to allow a defendant to call out a fact on cross-examination tending to weaken the prima facie case which the direct examination tended to prove, necessarily involves the principle, that a witness must be considered the witness of the party in whose favor he may happen to know any fact which would tend to modify or explain other facts stated on his direct examination. If this consideration is to determine whose witness he is, why would he not, thus far, be equally the witness of the party against whom he is called, if he should happen to state such modifying fact in his evidence in chief, where it properly belongs?

It may, indeed, be questionable whether the facts sought

CAMPAU v. DEWEY.

to be drawn out on the cross-examination, in *People v. Horton*, were relevant to the issue, or admissible at all, in any stage of the case; and the case may therefore have been correctly decided, though the reason given for the decision did not apply to that case. But if the evidence was relevant to the issue, or admissible at all, it was admissible to rebut the inference of malice which the evidence in chief tended to prove. The onus of proving malice, as a necessary ingredient of the crime of murder, was upon the People. Any inquiry therefore which related to that fact related, I think, to the People's case, rather than to that of the defendant, within the sense of the rule relied upon by the court.

The formula in which the rule is expressed, as stated by Mr. Greenleaf, and cited by the court, seems to have originated with Judge Story, in *Phila. and Trenton R. R. Co. v. Stimpson*, 14 *Pet.* 547; and whatever may be the true interpretation of the language, it is not a little remarkable, 1st. that he cites no authorities, and 2nd, that no such question was involved in the case (as will clearly appear by the report). All that was said upon it was extra judicial. And, although a mere dictum from so eminent a judge is always worthy of consideration, yet this case does not give the rule any judicial authority. The Judge expressly waives the point, and decides the case on another ground. The language in which the rule is expressed is deficient in clearness, and liable to mislead as to the real extent of its meaning, and there is little in the case in which it was used to aid in its interpretation. The rule, as stated by Judge Story, is, "that a party has no right to cross-examine any witness except as to facts and circumstances connected with the matter stated in his direct examination. If he wishes to examine him as to other matters, he must do so by making the witness his own, and calling him in the subsequent progress of the cause.'

Now if by "facts and circumstances *connected with* the

MICH. 9—2C

matters stated on his direct examination," he intended any
facts and circumstances which tend to controvert, explain
or modify the facts stated on the direct examination, or
which bear upon the same main fact which the direct
testimony tended to prove—and I think this must have
been his meaning, as facts thus related are, when used
in evidence, logically connected — then he only expressed
in other words the rule which I have endeavored to show
is founded in purely logical principles. But if he intended
any more intimate or limited connection, and to confine
it to a direct connection between the particular facts elicited,
without reference to their bearing upon the same main
fact, I can see no satisfactory principle upon which the
rule can rest. If the connection of facts of which he
speaks be understood in the extended sense suggested, he
had at least some very respectable authority for its sup-
port; but if in the narrow sense which seems to have
been understood in *People v. Horton*, then I am utterly
at a loss to discover upon what authority he based the
assertion, that it was " a principle now well established;"
and this assertion is made generally, with nothing to in-
dicate that it was intended to be confined to the Federal
courts : while Mr. Greenleaf, in citing the rule, only states
it as "now considered by the Supreme Court of the United
States to be well established ;" and the only authority he
cites from a Federal court, besides that of Judge Story
above quoted, is *Harrison v. Rowan*, 3 *Wash.* 588. This
case is so imperfectly reported that it is difficult to de-
termine the extent of the rule established by it. What
was the nature of the "new matter" to which it refers
does not appear, nor what was the extent of the direct
examination. But the case does not decide that the wit-
ness can not be interrogated on cross - examination as to
new matter; it merely denies the right to pursue such
cross - examination by leading questions. It clearly admits
the right to inquire into new matter on cross - examina-

tion, provided it be done without leading questions; and thus conflicts with that part of Judge Story's rule which compels the party to make the witness his own. The other authorities cited by Mr. Greenleaf in support of the rule (and also by the court in *People v. Horton*), are *Ellmaker v. Bulkley*, 16 *S. & R.* 77, *Floyd v. Bovard*, 6 *W. & S.* 75. The former of these cases was debt on an award, and the question arose in this way: I quote from the report: "The plaintiff having, on the trial in the court below, proceeded with his proof to establish the existence and loss of the award, and evidence to supply that loss by the examination of the referees, the defendant's counsel offered to cross-examine the witnesses on the subject matter of this suit, and *in avoidance* of the award, before he had opened his defense. This being opposed by the plaintiff's counsel, the court was of the opinion the defendant was not entitled to cross-examine the witnesses before he had opened his defense; to which the counsel for the defendant excepted." This decision was sustained by the court above; and this is all that appears in the case bearing upon the present question. It is manifest, I think, that the question was viewed as presenting itself substantially in the same form as if the attempt had been made to enter upon a like cross-examination of a witness who had merely proved the execution of the award, the proof already offered tending to show only what the written instrument would have shown, had that been introduced and proved; in which case the award would have spoken for itself: and the defense sought to be entered upon on cross-examination seems to have consisted, in part, at least, of matter of avoidance.

In *Floyd v. Bovard*, no such question as that we are now discussing was at all involved; and all that was said upon it is out of the case. After the plaintiff had examined the witness, and rested, the defendant called the witness, and proceeded to examine him as his own

(as I understand the case) to other facts material to the defense; to which course exception seems to have been taken by the plaintiff, for what reason I am as much at a loss to perceive as the court were; and the court held, as all courts would hold, that the defendant had this right: this is all the court really decides upon this point. It is true that Ch. J. Gibson makes use of the language quoted in *People v. Horton*, but that was not and could not be the ground of the decision. It is true, nevertheless, that even a passing remark of one of the ablest judges whose labors have adorned our judicial annals, is not to be treated as undeserving of respect; and some of his objections to the broad English rule are doubtless worthy of consideration. But he also uses language in the same case (not quoted in *People v. Horton*), which I think admits the distinction I have endeavored to establish in reference to what constitutes the plaintiff's and what the defendant's case, and the right of the defendant, on cross-examination, to draw out any facts calculated to weaken so much of the plaintiff's case as the direct testimony of the witness tended to prove. He says, "When the testimony of a witness is required to establish a fact which is part of the plaintiff's case, and also another fact which is part of the defense, it is a dictate of justice that no advantage be given to either party in the manner of eliciting it?" Now by "a fact which is a part of the plaintiff's case," is here intended, as I think the context shows, a fact involved in the issue, and the onus of proving which rests upon the plaintiff; or a substantial fact which is, *in itself*, essential to the support of the plaintiff's case; not merely those auxiliary or secondary facts which operate only as so many circumstances tending to the proof of that fact; these are merely accidental, not necessarily involved in the controversy; since it is entirely immaterial by what particular facts and circumstances this essential fact is proved, so that they have the effect to prove it. Thus

understood, the principle announced by Judge Gibson constitutes the basis of the rule I have endeavored to explain, as the logical rule, in its application to the present case.

The foregoing are all the authorities cited by Mr. Greenleaf, and relied upon in *People v. Horton*, for the rule in question. But we have been referred to several later cases, decided since the publication of Mr. Greenleaf's work, which it is claimed sustain the rule as applied in *People v. Horton*.

*Austin v. State*, 14 *Ark*. 555 (decided in 1854) is cited: In this case no question of this kind was involved. The witness sought to be cross-examined was sworn in chief, but was not interrogated or put upon the stand by the State. The prisoner claimed the right to cross-examine him upon the whole case, and relied upon the English rule. The court refused this. In sustaining this refusal, it is true, the court quote from Greenleaf the rule given in the language of Judge Story, and remark that, upon the examination of authorities, they think the decided preponderance in American courts is in favor of the rule. If they mean simply to say that the preponderance of American authority is against a cross-examination in such a case, I concur with them; and this was the only sense in which the remark could have any application to the case.

In *Cokely v. State*, 4 *Clarke* (Iowa) 480, this question was not involved ; the fact sought to be elicited on cross-examination was entirely irrelevant to the issue in any stage of the case; and though the court cite the rule from Greenleaf, the decision is not put upon that ground.

In *Donelly v. State*, 2 *N. J.* 494, the witness for the People had been examined only upon preliminary matters, to identify the deceased party mentioned in the indictment, and to prove certain maps of the premises. Neither he nor any other witness had yet been examined by the People touching the merits (see *Attorney General's Statement, p.* 488), and the defendant, in that stage of the case, proposed

to go into the merits on cross-examination; which the court held he was not entitled to do. The court do not profess to base their decision on the rule in question.

There is however one case, *Landsberger v. Gorham*, 5 *Cal.* 450, in which the court evidently took the same narrow view of the rule which was taken in *People v. Horton*, without, however, giving any reason, or citing any authority except the dictum of Judge Story, already mentioned; and the court held that, where an attorney or his agent, called to prove a sale of personal property, had, on his direct examination, testified only to the delivery of the property from the supposed vendor to the supposed vendee, he could not be called upon to state the conversation between the parties accompanying the delivery and giving character to the act; because, first, he was not bound to betray professional confidence (he having claimed his privilege), and second, because the proposed cross-examination was not relevant to the examination in chief. The first reason given is not calculated to increase our confidence in the correctness of the second; but such a case was, perhaps, needed as a practical illustration of the startling consequences which legitimately result from the rule thus narrowly construed. This is the only case I have been able to find which supports the rule as applied in *People v. Horton*.

Such are the authorities in support of the rule, so far as they have been referred to by counsel, and so far as any have fallen under my own examination. And, except as to the cross-examination of a witness who has not been examined at all in chief, or only as to preliminary or formal proof not going to the merits, the rule, so far as it differs from the English rule, is supported by the authority of comparatively few cases, whatever may be its true interpretation; and with these qualifications, the majority of American cases I think still favor substantially the English rule. See the cases cited by the counsel for the plaintiff in error. And notwithstanding it is said in

*People v. Horton*, to have been "the established rule in this State," I must protest my entire ignorance of the prior existence of the rule as it was applied in that case; though in some of the circuits the principle of the rule expressed in the language of Judge Story had been adopted.

While the rule may be salutary in its operation, when not extended beyond the principle on which it rests; I do not deem it necessary here to decide between the respective merits of that, and the common law or English rule, with the modifications of the latter which I have already suggested; since the rule as applied in *People v. Horton* is equally a violation of both.

But there are many objections to the rule as applied in *People v. Horton*. It impairs the efficiency of cross-examination as a means of detecting error and exposing falsehood, and renders it comparatively easy for a corrupt party, by the aid of corrupt witnesses, to fabricate fictitious cases without the risk of impeachment, compelling the opposite party to make the witness his own, as to facts which might tend to modify the effect of his evidence in chief; thus precluding the power of impeachment.

It tends to break up into detached and widely separated fragments, the state of facts within the knowledge of the witness, bearing upon the same main point, and which would be much better understood if stated as one connected whole. The testimony of other, and perhaps many other, witnesses intervening between the parts of the witness's testimony, the jury are more likely to confound the testimony of one witness with that of another; the bearing of the different parts of the witness's testimony upon each other, and any discrepancies which may exist are not so easily discovered, and, consequently, the credit of the witness is not so correctly estimated.

But there is a practical difficulty in the application of this rule (as understood in *People v. Horton*) inherent in the rule itself, and which can only be avoided by getting

rid of the rule, as there applied. It adopts, as the test of the relevancy of a cross - examination, the bearing of the particular facts sought to be elicited by it, upon the particular facts brought out on the direct examination, instead of the main fact or facts which these particular facts tend to prove; and, as these particular facts are often very numerous, and their number and character incapable of restriction, and the question of relevancy may arise upon any two of them, and as the degrees of relation between them may be as numerous and varied as the facts themselves, it is easy to see that questions of this kind must be constantly arising, till the case bristles with points of relevancy. The rule, therefore, leads to almost infinite embarrassment; and it must, and often does, require more time to dispose of these questions of relevancy, under this rule thus understood, than would otherwise be required for the trial of the cause. On the other hand, if the question of relevancy is to be determined with reference to the main or essential fact, which the particular facts stated on the direct examination tended to prove, and by considerations connected with the burden of proof, questions of relevancy would be much less frequent, and comparatively easy of solution.

Several exceptions were taken to the ruling of the court excluding hearsay and evidence of reputation and common report, or general understanding, after the treaty, among the Indians and other persons acquainted with the parties, going to show who was the Taucumegoqua intended by the treaty.

If this were a new, or could properly be considered an open question, it would be one of much difficulty. Considered as a question of principle, without reference to authority, the reasons for and against its admission are so nearly balanced that good legal minds might well arrive at different conclusions. For myself, I must admit that the reputation and general understanding among the Indians

CAMPAU v. DEWEY.

and the whites who were at the treaty, and in constant intercourse with them for years after, and well acquainted with the parties—a reputation commencing immediately after the treaty, and continuing for many years after—would be quite as satisfactory to my own mind as the faint and uncertain impression of particular facts which, alone, would be likely to remain in the mind of a witness forty or even twenty years after the facts occurred, unless indeed the fact were one of peculiar interest to the witness himself. And I think the general fact of such reputation and common report, as to the person who got land at the treaty, would be less likely to be forgotten than any particular occurrence at the treaty, and quite as reliable as the feeble memory of such particular occurrence, after the lapse of so many years. Both species of evidence are exceedingly unsatisfactory.

But we do not feel at liberty to treat this as an open question. The same question, arising under the same treaty, substantially in all the forms here presented, was directly decided by the Supreme Court of this State in *Stockton v. Williams*, 1 *Doug. Mich.* 546. This decision has, for sixteen years, been recognized as the law governing the titles under this treaty, at least, and these must be quite numerous, many of which have doubtless been bought and sold on the faith of this decision. We are therefore compelled to recognize it as a rule of property which we are not at liberty to disturb. There was no error, therefore, in excluding the evidence in question.

But the counsel for plaintiffs in error insist that several of the questions in relation to this hearsay and reputation were admissible to show that Madame Coutant bore the Indian name of Taucumegoqua, though the evidence might not be admissible for any other purpose.

Doubtless the fact, that a person was known by a particular name, is one which may be proved by reputation; and this would be original, and the best evidence of the

fact. But the questions proposed to the witnesses did not indicate the purpose of calling for reputation upon this point, but another and a different point, to show by reputation that the person in question got land at the treaty and this, we have seen, was inadmissible.

It is insisted that the act of Congress of June 15, 1844 (6 *U. S. Stat. at Large*, 913) authorizing a patent for the land to Joseph Campau, the patent itself, and the affidavits filed under the act, ought to have been admitted, as tending to show by hearsay or reputation, that Madame Coutant bore the name of Taucumegoqua. It was not claimed on the argument that the act or the patent could directly affect the rights of the parties, as a law or a patent; and they certainly could not, as the title passed by the treaty, and was beyond the control of Federal legislation. All questions affecting the title were judicial questions only. The act and all proceedings under it were *res inter alios*, and the proofs taken under it were not only *ex parte*, but extra judicial; and we can discover no ground on which the act, the proofs taken under it, or the patent, could be received as the mere declarations of third persons; they were no part of the *res gestae*, and were made long after the event upon which alone they could operate, if not also *post litem motam*.

It is also assigned as error that the court overruled the following question to Louis Campau, a witness for the defendants below: "During the seven years succeeding the treaty, did you ever hear any of Neome's band claim that any reserves of land had been made at the treaty for any full blooded Indian children of that band?"

We think this question was properly overruled. *First*, it does not appear from the bill of exceptions that for seven years, or even for a single year, after the treaty, the witness had any intercourse with these Indians, or was in a position which would make it probable that he would have heard it, had such claim been made. *Secondly*,

the neglect of the other members of the tribe could not affect her right to the land, if she were the grantee. And *thirdly*, as she was but six years old at the treaty, and only thirteen at the termination of the seven years, she could hardly be affected by her own neglect, especially as she does not appear to have been engaged in agriculture, or to have needed its use, more than the wild animals which roamed over it.

All the remaining assignments of error, which we shall notice, relate to the refusals of the court to charge as requested, and to the charge as given.

The substance of the several requests, stated in their logical order, was, *First*, that the terms "Indians by descent" used in this treaty as descriptive of all the individual reservees, must be interpreted to mean persons of mixed white and Indian blood, and not full blooded Indians; or if, as matter of law, the language of the treaty, when judicially construed, does not exclude Indians of the whole blood, then, *Secondly*, that from the language of the treaty, the policy of the government, as indicated by the Indian treaties and other public records of the time, the despatch of Gen. Cass, and the habits and modes of life of the Chippewa nation, including Neome's band, a presumption arises that all the individual reservees, including Taucumegoqua, were, or were supposed to be, not full bloods, but half breeds, or persons of mixed white and Indian blood.

If the language of the treaty, in connection with all the matters above referred, to be such as to require, or to enable us, as matter of construction, to confine the terms "Indians by descent" to half breeds, or persons of mixed blood, then no person of full Indian blood was competent to take under the treaty, and all the evidence on the part of the plaintiffs tending to show such a reservee, was irrelevant, and should have been excluded. But this does not appear to have been the view taken by the counsel of the defendants below, as they do not appear to

have objected to the evidence. And upon a full and careful examination of this treaty, and many other Indian treaties, the instructions under which they were made, the despatches accompanying them; and other public records of the time, we are entirely satisfied that we are not authorized to construe the terms in question in the narrow sense claimed for them, and that, whether viewed as a question of law to be settled by construction, or as one of presumptive evidence, the court below was right in refusing the instruction asked.

We are hardly to expect strict technical accuracy and precision of language in these Indian treaties. In some of the treaties, as for example, that at the Foot of the Rapids, September 29, 1817, and that of St. Mary's, October 2, 1818 (at both of which Gen. Cass was a commissioner) these terms are not used. In the former, the individual grantees are collectively described as "connected with the said Indians by blood or adoption," the grants are made, as I infer from the treaty, some to Indians, some to whites, and some to those of mixed blood, but the latter are particularly described as half breeds, or their genealogy is, in part, given, showing them to be such; and the last remark is especially true of the treaty last referred to. In the treaty of St. Mary's, October 6, 1818 (Gen. Cass one of the commissioners) the grantees are collectively described as "Miami Indians by birth," and the list begins with French christian and surnames; it is then intermixed with single Indian names without any additions, and closes with five who are severally and particularly described as "half bloods." In the treaty of Chicago, August 29, 1821 (Cass and Sibley, commissioners) the individual reservees are described as "being all Indians by descent," several of them with English and several with French names have their "descent" given, and appear to be half breeds or mixed bloods; while several are described in a manner appropriate only to Indians of the whole

blood; and doubtless were such; as (among others) "Menaw-che, a Pattiwattima woman." See also treaty of St. Joseph, 20th September, 1828.

In view of these treaties we are entirely satisfied that the terms "Indians by descent" have often been used, not only as descriptive of mixed Indian blood, but also (where the persons named were of both kinds) as collectively applicable both to those of the full blood and those of mixed white and Indian blood: and the terms are in themselves applicable to both, though more strictly to those of the whole blood.

Quite as little aid can be derived in favor of the presumption (claimed by the plaintiffs in error) from the policy of the Government, as indicated by the instructions given to commissioners, and other public records of the time. All that can be safely affirmed upon this point is, that in the Indian treaties throughout the Northwest, as a general rule, the policy of the Government seems to have been to avoid, as far as possible, all such special reservations or grants of land to individuals, whether of the full blood of either, or mixed blood of both races: and that they were assented to only as a means of obtaining the consent of the Indians to the cession of their possessory rights in the territory, which the Government sought to acquire. See especially letter, Mr. Calhoun to Lewis Cass and Duncan McArthur, May 11, 1818, and letter of C. Vandeventer to same, September 18, 1818: *American State Papers, Indian Affairs, vol.* 2, *pp.* 175, 176.

As the terms descriptive of the grantees were extensive enough to include both full bloods and mixed bloods, and it does not conclusively appear from the treaty whether both were included or only one, if there be two claimants of the same name mentioned in the treaty, one of the whole and one of the mixed blood, they equally come within the words of the treaty; and it is but the common case of a latent ambiguity created by facts outside of the in-

strument, and therefore explainable by extrinsic evidence, and to be determined from all the evidence in the case.

We are therefore of opinion that the court below was clearly right in instructing the jury that it was entirely a question of fact for them to determine, who was the reservee intended by the treaty. But it is somewhat questionable whether this view was consistently carried out in the subsequent portion of the charge. The Constitution of Michigan, which might perhaps be properly enough referred to as an illustration of the sense in which the terms, "Indians by descent," have been sometimes used, could with little propriety be relied upon as affixing "*a legal meaning*" to the same terms as used in this treaty thirty years before; nor could it properly be left to the jury to find whether such was their "*legal meaning.*" The legal meaning, so far as the terms might have any fixed or definite legal meaning, was a question for the court. And if he intended to say that, by their legal meaning the terms could only apply to cases where both whole and mixed bloods were included, it was equivalent to instructing the jury that there must be among the reservees under this treaty persons of both descriptions, in order to satisfy the words of the treaty; and, if understood in this sense, the charge might materially influence the determination of the main question in the case (who was the reservee) as a question of fact.

But, though the charge in this respect was somewhat ambiguous, I am inclined to think the terms "legal meaning," were not intended to be used by the court in their technical sense, and that, taking the charge as a whole, he did not intend to say that there must be among the reservees under this treaty persons both of the whole and of the mixed blood: though the latter portion of the charge is not entirely clear, and was liable to be misapprehended. Still, if this were the only error complained of, I should not be disposed to disturb the verdict. But for the error in

overruling the questions put to Noc-chic-a-me on cross-examination, the judgment, I think, should be reversed, and a new trial ordered.

There are several assignments of error upon the record besides those already noticed, but as the counsel for the plaintiffs in error declined to argue them, we have not thought it our duty to consider them.

Manning J.:

I can not agree with my brother Christiancy, that the court erred in refusing to let defendants' counsel ask Noc-chic-a-me, on his cross-examination, whether Owashamegon was related to Tonedagone. On his direct examination the witness was not asked any question as to either of those persons, nor did he so much as mention either of them. He was asked to whom individual reservations were made at the treaty; and in his answer mentioned Tawcumego-qua and a number of others, but made no mention of Owashamegan. But on his cross-examination, he stated Owashamegan got land at the treaty; and he was then asked the question objected to and ruled out by the court, viz: was this Owashamegan any relation to Tonedogane? By the treaty six hundred and forty acres of land were reserved to one Tawcumegoqua, which the plaintiffs claimed under an Indian of that name; and Noc-chic-a-me was examined by them to show that the Tawcumegoqua under whom they claimed was the Tawcumegoqua mentioned in the treaty. At that stage of the trial, without any statement of the use to be made of it in the further progress of the cause, the court could not see what the fact inquired about had to do with the case, or with any fact stated by the witness in his direct testimony. But the plaintiffs in error, who were defendants in the court below, insist before us that it was competent for them to put the question, as they claim the land through Owasha-megan, a half blood Indian, known by the name of Tau-

cumegoqua, on the ground that the only issue between
the parties was as to which of these two persons was the
Taucumegoqua mentioned in the treaty; and that whatever
tended to prove their case, in the same degree tended to
disprove the plaintiffs' case. How did the court know de-
fendants claimed ‧ the land under Owashamegan, and that
she was known by the name of Taucumegoqua as well as
Owashamegan? If the court was bound to sit and hear
such questions put and answered without seeing or being
informed by counsel of any possible object to be gained
thereby, because the witness had stated on his cross-ex-
amination, that Owashamegan got land at the treaty, it is
not easy to see why like questions might not have been
put to the witness regarding every person to whom a
reservation was made; and why the relationship existing
between each of those persons and every other Indian be-
longing to the tribe might not have been inquired into.
Waiving this objection, which seems deserving some little
consideration, and supposing the object had been stated
to the court at the time, it does not appear to me that
the question was one defendants had a right to ask on
cross-examination. The advantages of a cross over a direct
examination consist in asking leading questions, and in the
right to impeach a witness after cross-examining him, if
his testimony makes against you. The plaintiffs' case con-
sisted in proving that the Taucumegoqua under whom they
claimed was the person intended by that name in the
treaty; the defendants' defense in proving that Owashame-
gan, alias Taucumegoqua, was that person. Such being the
case, if the right contended for exists, it gives the defend-
ants advantages not contemplated by the rules regulating
cross-examinations. It would not only enable them to ask
leading questions of plaintiffs' witness to prove their de-
fense, but to get rid of the facts elicited by themselves,
if distasteful, by impeaching the witness. Plaintiffs had
proved by the witness certain facts tending to show that

the Tawcumegoqua under whom they claimed was the person intended by the treaty. Defendants did not propose by the questions they put, according to their own theory, to disprove any one of those facts, or to modify or change them in any respect whatever, but to prove other facts (consistent with the truth of every statement made by the witness on his direct examination) tending to prove Owashamegan was the person intended by the treaty. The object in permitting leading questions on cross-examination I understand to be to elicit all the light the witness can throw on the facts testified to by him on his direct examination, and not to permit either party to prove his case by his adversary's witness in a different mode from what he would be required to do had he called the witness on the stand himself. I am not now speaking of questions put on cross-examination to test the witness's memory or credibility. They are always in the discretion of the court. The reason generally given for the difference between a direct and cross-examination is, that the witness. is supposed to be biased in favor of the party calling him. There would be something in this if it was optional with a party to select his witnesses from among his friends. But this he can not do. He is under the necessity of calling on the stand such persons, whether friends or foes, as know the facts he is required to prove. Witnesses may be and sometimes are biased in favor of the party calling on them to testify; but it proceeds from some cause other than the fact that they are called on by one party and not by the other. And it is by no means so common that any general rule for the examination of all witnesses can legitimately be based upon it. I am therefore of opinion the reason of the rule allowing leading questions on cross-examination is the one I have stated, and that the rule is to be confined to questions calculated to elicit further light on facts that the witness has testified to on his direct examination. After full consideration, and after

viewing the question in all its different bearings, I am satisfied with the rule laid down by this court in the case of *The People v. Horton.* It is said the rule at times is difficult of application. Not more so, I think, than all rules; and when there is any difficulty, it may always be obviated by permitting the question to be put and answered, as any error in this direction would not lead to a reversal of the judgment, unless, perhaps, in a very clear case of abuse. On the other questions in the case, I agree with my brother Christiancy. I think the judgment should be affirmed.

MARTIN CH. J. :

I concur with my brother Christiancy in all respects except as to the rulings upon the questions put to Noc-chic-a-me on his cross-examination; and as to those I concur with my brother Manning in adhering to the rule of *The People v. Horton;* which I think to be a sound rule, and one too long established in this State to be disturbed. The application of the rule in that particular case I do not propose to discuss. It is the *principle* which I approve. It is from a misapprehension and misapplication of that rule that difficulties have arisen, and not from any inherent faultiness in the rule itself. The syllabus to the case very clearly and tersely states the rule thus: "It is the settled rule in this State that a party has no right to cross-examine witnesses upon facts and circumstances not connected with the matters stated in his examination in chief;" and the reason for the rule is very well given in the opinion of the court, and requires no further elucidation from us.

In the case at bar, I am frank to say, that I think the questions ruled out were proper cross-examining questions. The examination in chief related to the treaty, and the persons present and who acquired land under it. For purposes of identification, if for no other, the questions

CAMPAU v. DEWEY.

might have been allowed. If the defendants intended to pursue the inquiry so as to make out or attempt to make out a substantial defense, as that Owashamegan was the Taucumegoqua of the treaty, and thereby establish their own title to the lands in controversy, the court very properly stopped them. What the purpose of the inquiry was, does not appear to have been announced to the Judge; and the exclusion of the inquiry under the circumstances was no such grave error as should reverse the judgment. As remarked in *People v. Horton*, the rule regulates the manner of the examination. The party loses no rights. He only postpones the time of introducing his witnesses: and in the present case no effort appears to have been made to pursue this inquiry after the case was with the defendant. I therefore think no injury was done, and that no sufficient cause exists for reversing the judgment.

*Judgment affirmed.*

CAMPBELL J. did not sit in this case, having been of counsel.